# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Criminal Action No. 2011-001** |
| | ) | |
| **MIGUEL ANGEL** | ) | |
| **PASCUAL-PICHARDO**, | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**Attorneys:**
**Alphonso Andrews, Esq.,**
**Rhonda Williams-Henry, Esq.,**
St. Croix, U.S.V.I.
 *For the United States*

**Martial A. Webster, Sr., Esq.,**
St. Croix, U.S.V.I.
 *For the Defendant*

## <u>MEMORANDUM OPINION AND ORDER</u>

FINCH, Senior Judge

 THIS MATTER comes before the Court on Defendant's "Motion to Suppress Statements," filed on July 14, 2011, (Dkt. No. 37); Defendant's "Addition to Motion to Suppress Statements," filed on March 8, 2012, (Dkt. No. 71); and Defendant's "Motion for Reconsideration of Denial of Suppression of Search and Seizure," filed on March 8, 2012, (Dkt. No. 72). For the reasons that follow, the Court will deny Defendant's "Motion to Suppress Statements," (Dkt. No. 37); deny Defendant's "Motion for Reconsideration of Denial of Suppression of Search and Seizure," (Dkt. No. 72); and deny as moot Defendant's "Addition to Motion to Suppress Statements," (Dkt. No. 71).

# I.  BACKGROUND

## A.  Factual Background[1]

After infiltrating a drug smuggling organization in Puerto Rico in 2010, agents working for the Department of Homeland Security and Immigrations and Customs Enforcement contacted Defendant as part of an undercover operation to identify the source of narcotics distribution in St. Croix and Puerto Rico. (03/16 Tr. at 9:13-17; 03/20 Tr. at 50:21-25; 51:1-5) (testimony of Special Agent Jose Lebron). On January 8, 2011 at 11:41 a.m., Agent Melvin Alvarado Pagan in Puerto Rico, playing the role of a vessel commander, contacted Defendant in St. Croix via telephone to set up the transportation of cocaine that Defendant was to deliver to Puerto Rico from St. Croix. (03/20 Tr. at 22:3-6; 25:20-24) (testimony of Officer Melvin Alvarado Pagan) ("The defendant's role was the coordinator of the criminal organization here in St. Croix, that he was in charge of turning over the drugs to me and to return with me to Puerto Rico so he would come in in a safe way."). Agent Pagan knew that Defendant was transporting cocaine "because it was part of an investigation that was in San Juan where a criminal organization had brought it in." (03/20 Tr. at 26:6-8).

At 12:38 p.m. on January 8, 2011, Defendant telephoned Agent Pagan to ask for approval to give his telephone number to Defendant's boss in Puerto Rico. (03/20 Tr. at 24:4-10). Agent Pagan returned the call at approximately 2:30 p.m., granting permission for Defendant to provide his number to Defendant's boss. (03/20 Tr. at 25:2-4). During this conversation, Agent Pagan and Defendant spoke about the drugs that Defendant possessed in St. Croix and agreed upon the

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing and affidavits and documents accompanying the parties' filings relating to the Suppression Motion. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

packaging of the drugs for transport to Puerto Rico. (03/20 Tr. at 25:4-11) ("We spoke about the load that he [Defendant] had here, and I [Agent Pagan] told him to have it ready . . . .").

On January 9, 2011, Agent Pagan contacted Defendant to inform Defendant that he had arrived in St. Croix and to instruct Defendant to meet him in Gallows Bay at 2:00 p.m. (03/20 Tr. at 25:4-11). When Defendant met Agent Pagan at Gallows Bay,[2] Defendant indicated that two hundred kilograms of cocaine were "ready" for Defendant to pick up and bring back to Agent Pagan. (03/20 Tr. at 26:24-25; 03/20 Tr. at 27:2-4). As Agent Pagan testified, "the plan was I was going to give him a vehicle, a jeep, and he was going to go get that drug[s], and he was going to come back to me." (03/20 Tr. at 27:6-9).

Accordingly, after meeting at Gallows Bay, Agent Pagan provided Defendant with a rental vehicle—a grey Jeep Cherokee—so that Defendant could drive to the location where the cocaine was located.[3] (03/20 Tr. at 27:6-9). At that point, Agent Pagan had no knowledge of the location of the cocaine.[4] (03/20 Tr. at 29:12). Agent Jose LeBron similarly testified that he had no knowledge of the site or source of the cocaine, and explained that the purpose of the operation

---

[2] Defendant arrived in St. Croix on his own, without any involvement from law enforcement. (03/16 Tr. at 22:23-25) (testimony of Agent Jose LeBron) ("He came on himself. We did not arrange for him to come to St. Croix."). Defendant also arrived at Gallows Bay on his own. (03/16 Tr. at 27:26-28:1) ("He arrived in a blue Chevrolet Lumina driven by a female.").

[3] Defendant suggested—without offering any evidence—that the undercover agents planted cocaine in the Jeep prior to providing Defendant with the Jeep. (03/09 Tr. at 11:8-13) ("They gave him a jeep. These undercover agents put drugs in the jeep, gave him a jeep with drugs in it."). However, Agent Alvarado testified that there were no drugs—or anything else—in the Jeep when it was given to Defendant: "Let me explain, that these vehicles we use them for cases like this, undercover cases, it's part of our regulation for our safety to give a security check to the vehicle to make sure there is nothing in the vehicle." (03/20 Tr. at 27:18-22) (testimony of Agent Alvarado). Agent LeBron corroborated that "[n]othing was in the vehicle." (03/16 Tr. at 11:16) (testimony of Agent LeBron).

[4] Agent Pagan had no involvement with the movement of the cocaine from its storage place to its intended destination of Gallows Bay. (03/20 Tr. at 29:18) (testimony of Agent Pagan).

involving Defendant on St. Croix, and the reason for giving Defendant a vehicle to drive to the location of the cocaine, was to identify the source of the cocaine on St. Croix. (03/20 Tr. at 50:21-24) (testimony of Agent LeBron) ("I wanted to know who the source was, and only he [Defendant] knew who the source was.").

Defendant then departed Gallows Bay in the vehicle provided to him by Agent Pagan and traveled westbound to a residential area known as Whim Estates. (03/16 Tr. at 11:17-12:9). Defendant was followed by surveillance units, which included Agent LeBron. At some point during the drive from Gallows Bay to Whim Estates, Defendant picked up an unidentified individual who traveled with Defendant to Whim Estates.[5] Upon arrival in Whim Estates, Defendant parked the Jeep backwards into a residence with an attached wood shed.[6] (03/16 Tr. at 11:23-13:24). The unidentified individual accompanying Defendant "opened his door and assisted the vehicle by opening the gate." (03/16 Tr. at 13:6-7). Subsequently, Agent LeBron drove around the block, because "obviously we [law enforcement] could not stand in front of the house," and, upon Agent LeBron's return five minutes later, Defendant had left the house. (03/16 Tr. at 15:3-4).

After Defendant left the residence at Whim Estates, Agent LeBron contacted Task Force Agent Edgardo Ojeda and "notified him that the vehicle had left the residence and to stop the vehicle." (03/16 Tr. at 15:19-16:4). Agent LeBron testified that Task Force Agent Ojeda had been instructed in a previous meeting that after receiving this instruction "he would have to

_____

[5] In his testimony, Agent LeBron explained "[d]uring the surveillance proceedings . . . we cannot follow a car consistently. What we do, follow the car, we turn right, turn a little later and continue following the vehicle slowly. During the time from Gallows Bay to the residence, someone else got into the vehicle." (03/16 Tr. at 29:3-7).

[6] The following day, agents "conducted a search warrant on that residence [and shed] and discovered over seven hundred kilograms of cocaine in the residence." (03/16 Tr. at 13:18-20).

continue following the vehicle and observe if the vehicle committed any traffic violations. If the vehicle committed any traffic violations, he could stop the vehicle. But if the vehicle did not commit any traffic violations, he could not stop the vehicle." (03/16 Tr. at 16:9-14).[7] Accordingly, after Defendant left the residence at Whim Estates, Task Force Agent Ojeda, working with a partner, Detective Daniel Rodriguez, in a marked car, conducted a traffic stop of Defendant at approximately 3:30 p.m. near Estate Sunny Isles. (6/22 Tr. at 5:19-6:4) (testimony of Task Force Agent Edgardo Ojeda).

Task Force Agent Ojeda testified that he "stopped the vehicle because the driver committed a traffic infraction . . . the driver was operating a vehicle using a cell phone without a hands free device . . . He had the phone to his ear." (6/22 Tr. at 6:7-23). Task Force Agent Ojeda continued "[t]hat's a violation of Title 20, Virgin Islands Code, Section 509." (6/22 Tr. at 7:13-14).[8] After Task Force Agent Ojeda "initiated the emergency blue lights and siren to indicate to the driver that [he] was attempting to stop him," Defendant briefly hesitated before stopping. He then "exited the vehicle abruptly" and approached the Task Force Agent Ojeda and Detective Rodriguez, (6/22 Tr. at 7:21-8:6), both of whom instructed Defendant to "stop, and produce his driver's license, registration, and proof of insurance." (6/22 Tr. at 8:13-15). Defendant indicated that he did not speak English. Accordingly, Detective Rodriguez repeated the request in Spanish. (6/22 Tr. at 8:20-25).

Defendant then produced a Puerto Rico driver's license to Detective Rodriguez and

---

[7] At the June 22, 2011 evidentiary hearing, Task Force Agent Ojeda testified that he has been employed by the Virgin Islands Police Department for 18 years and that he was assigned as a Task Force Agent with the Department of Homeland Security during the June 9, 2012 arrest. (6/22 Tr. at 5:6-13) (testimony of Task Force Agent Ojeda).

[8] Defendant testified that he was not speaking on the phone while driving: "I was not driving the car while I was talking on the phone. I was off the road and speaking on the phone." (6/22 Tr. at 49:21-22. (testimony of Defendant Pichardo).

repeatedly stated that he didn't know anything about the registration and proof of insurance because the vehicle was rented. (6/22 Tr. at 12:8-12). At the suggestion of Detective Rodriguez, Defendant looked in the glove compartment and successfully retrieved the rental contract for the vehicle. (6/22 Tr. at 13:12-16).

While Detective Rodriguez acquired documents from Defendant, Task Force Agent Ojeda approached Defendant's vehicle from the rear right-hand side and "observed the vehicle interior, for safety, you know, just in case there might be anyone else in the vehicle." (6/22 Tr. at 10:9-12.) Task Force Agent Ojeda observed both that "the defendant was acting real nervous," and "the vehicle had numerous large duffel bags, dark duffel bags in the rear, and rear seat passenger seats, and in the trunk area." (6/22 Tr. at 10:14-22). Task Force Agent Ojeda then asked Defendant "if he had anything, any weapons, anything illegal in the vehicle." (6/22 Tr. at 13:18-20). Defendant answered "no," and consented to a search of his vehicle by Task Force Agent Ojeda. (6/22 Tr. at 13:20-23) ("I asked him if he minds me taking a look. He says no, go ahead."). Task Force Agent Ojeda then asked Defendant if he could look into one of the duffel bags. Defendant said "go ahead." (6/22 Tr. at 14:14-15). When Task Force Agent Ojeda "partially opened one of the bags" he observed "some bricks, like objects wrapped in plastic." (6/22 Tr. at 17:18).

Defendant then unzipped another duffel bag completely, and when Task Force Agent Ojeda asked him to identify the contents of the bag, Defendant responded "you know what it is." (6/22 Tr. at 14:21-15:3). After Task Force Agent Ojeda responded that it looked like bricks of cocaine in the duffel bag, Defendant stated: "[o]h my family, my family. Look what I did for a couple dollars." (6/22 Tr. at 15:11-12). Defendant then stated "oh, I'm so sorry. I have a debt, and there was—it was going to pay me $3,000 to take the stuff. Look what I did for a couple

dollars." (6/22 Tr. at 15:11-15).[9] As Defendant described his debt and expressed his concern for his family, Task Force Agent Ojeda and Detective Rodriguez placed Defendant under arrest. Defendant then offered to give the duffel bags to the police in return for his release: "[G]o ahead and take the stuff. Let me go. Take the stuff. Take it and let me go."[10] (6/22 Tr. at 17:20-22). Task Force Agent Ojeda and Detective Rodriguez responded that "that's not the way we operate around here." (6/22 Tr. at 17:24-25). Defendant testified that after he made these statements, Task Force Agent Ojeda then "called the federals" and arrested him. (6/22 Tr. at 45:10-12) ("They called the officers, and they put me in the vehicle. And they take me to the office. And from there, they started asking me questions.").

After the arrest by Task Force Agent Ojeda, Defendant was transported to the Immigrations and Customs Office in the area of Sunny Isles Shopping Area. (03/16 Tr. at 16:19-18:8) (testimony of Agent LeBron). At the office, Agent LeBron collected Defendant's name and biographical information. Defendant was then advised of his rights in Spanish, by a form "created by the agency. And this form clearly has all of the rights in order, which, in which agent read the right to the Defendant. And at that time he initialed each right.") (03/16 Tr. at 18:18-19:3). Defendant then explained to Agent LeBron that "he had come to do this as a favor from Puerto Rico, and that he was getting paid very low money . . . about $3,000." (03/16 Tr. at 20:11-14).

Defendant's phone was "ringing excessively during the interview." (03/16 Tr. at 21:15-21). Defendant then agreed to cooperate with law enforcement by conducting "two consensual

---

[9] Defendant testified that after Task Force Agent Ojeda and Detective Rodriguez opened the duffel bags, he said "my goodness, what have I done? My family. Everything for two pesos." (6/22 Tr. at 45:2-3) (testimony of Defendant Pichardo).

[10] Defendant further testified that he told officers that he had a $10,000 debt to pay and that he was being paid $3,000 for his trip to St. Croix. (6/22 Tr. at 49:7-8).

calls, which he consented to from the office." (03/16 Tr. at 21:15-21). After Defendant agreed to cooperate, he put a recording device in his ear and placed a call to an unidentified male who Agent LeBron believed was Defendant's boss. (03/16 Tr. at 46:24-9).

## B. The Motions to Suppress

On May 13, 2011, Defendant filed a Motion to Suppress all evidence obtained during the January 9, 2011 traffic stop on the grounds that the evidence was acquired incident to an illegal stop, seizure and arrest in contravention of Defendant's Fourth Amendment rights. (Dkt. No. 26). Specifically, Defendant sought to suppress all items seized from his vehicle and any statements made by Defendant to the police after the allegedly improper search of his vehicle. Defendant argued that his Fourth Amendment rights were violated when the police searched his vehicle "without reasonable suspicion or any other legal justification, and its fruit [including Defendant's statements] must therefore be suppressed." *Id*. at 1. An evidentiary hearing was held on this matter on June 22, 2011.

 The Court issued an Opinion on July 5, 2011, denying Defendant's suppression motion. Although Defendant's Motion to Suppress was predicated upon alleged Fourth Amendment violations, the Court evaluated Fourth and Fifth Amendment grounds for excluding the evidence, and concluded that neither a Fifth nor Fourth Amendment violation occurred during the January 9, 2011, traffic stop:

> Although defendant did not raise the issue of a failure to provide *Miranda* warnings, the government also argues that (1) the defendant was not in custody when he made certain statements and thus police were not required to *Mirandize* the defendant, and (2) that other statements made by Pichardo were not responses to police interrogation and are thereby not suppressible for failure to provide *Miranda* warnings . . . To the extent that Pichardo implies that he was subjected to custodial interrogation and provided unwarned statements, the Court finds that position to be without merit.

(Suppression Opinion; Dkt. No. 35 at 1, 6). The Court considered that "persons

temporarily detained pursuant to [traffic] stops are not 'in custody' for the purpose of *Miranda*," *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984), and concluded that the traffic stop was neither custodial nor an interrogation, meaning the police were not required to inform Defendant of his *Miranda* rights. (Suppression Opinion; Dkt. No. 35 at 6-8).[11]

On July 14, 2011, Defendant filed a "Motion to Suppress Statements," asking the Court for "a hearing and an opportunity to present full and complete evidence and argument on whether or not he was in custody at the time of his statements and therefore, whether or not *Miranda* was required." (Dkt. No. 37 at 2). In his Motion, Defendant argued that he was in custody at the time of his statements, that he was not advised of his *Miranda* rights and, accordingly, that his statements should be suppressed. *Id*.

On March 8, 2012, Defendant filed a "Motion for Reconsideration of Denial of Suppression of Search and Seizure," requesting that the Court reconsider its July 5, 2011 decision "in light of the Third Circuit Court of Appeals recent decision in *United States v. Lewis*," 672 F.3d 232 (3d Cir. 2012). (Dkt. No. 72). On March 8, 2012, Defendant also filed an "Addition to Motion to Suppress Statements," seeking to suppress the statements made by Defendant during the recorded telephone conversations in the Immigrations and Customs Office on the grounds that Defendant's provision of those statements was involuntary. (Dkt. No. 71).

_____

[11] The Court alternatively considered that, even if some of Defendant's statements were custodial, they were not the product of interrogation and consequently did not require the protections of *Miranda*:

> It is not clear whether the remaining statements made by Ojeda [sic] [Defendant] concerning the amount of money he was paid to move the cocaine, the reason he agreed to do it, or his offer to the police to take the cocaine in exchange for his liberty, were made before or after he was under arrest." However, that is irrelevant in this case because the statements were spontaneous utterances and not the product of interrogation. Thus, they do not fall under the protection of *Miranda*. *See Rhode Island v. Innis*, 446 U.S. 291, 300-02 (1980).

(Suppression Opinion; Dkt. No. 35 at 8).

The Court held evidentiary hearings on these three motions on March 9, 2012, March 16, 2012 and March 20, 2012.

## II.    ANALYSIS

At the March 9, 2012 evidentiary hearing, Defendant began his argumentation by introducing a hypothesis of the background surrounding his arrest:[12]

> Judge, I'm going to try to put things in perspective . . . law enforcement agents . . . followed [Defendant] from Puerto Rico. They were talking to him on the telephone as undercover agents; he was not aware. They gave him a Jeep. These undercover agents put drugs in the jeep . . . and asked Police Officer Ojeda . . . to traffic stop him.

Accordingly, Defendant presented his suppression arguments within the broader picture of a government "set up," whereby federal agents allegedly provided Defendant with a vehicle containing drugs, then conducted a traffic search on that vehicle for the purposes of entrapping Defendant. (03/09 Tr. at 13:13-22). Defendant's arguments for suppression were thus predicated on the theory that "this was no regular traffic stop." (03/09 Tr. at 14:18).

After hearing the presentation of Defendant's theory at the March 9, 2012 evidentiary hearing, the Court scheduled two additional evidentiary hearings to allow for the full presentation of evidence on this issue: "It seems to me as if I [the Court] would need to hear from agents in Puerto Rico that they hadn't [entrapped Defendant], that his [Defendant's]

---

[12] After the filing the May 13, 2011 Motion to Suppress, the June 22, 2011 evidentiary hearing and the filing of the July 14, 2011 Motion to Suppress, Defendant obtained new counsel. At the March 9, 2012 evidentiary hearing, Defendant's new counsel emphasized that he "wasn't the lawyer that did the first suppression hearing" and that "new information [that] came to light through discovery" allows him to "put things in perspective for the Court." (03/09 Tr. at 10:11-13;15-16; 21-22). Specifically, evidence involving the undercover operation by federal agents was not presented at the June 22, 2012 evidentiary hearing. Instead, at the June 22, 2012 hearing, the Government only presented evidence that Defendant was subject to a traffic stop for committing a traffic violation. The March 9, 2012, March 16, 2012 and March 20, 2012 evidentiary hearings were devoted to the presentation of evidence about the nature and scope of the undercover operation.

hypothesis is false, and that they [federal agents] had nothing to do with this kind of arrangement that Mr. Webster [Defendant's counsel] postulates." (03/09 Tr. at 16:16-19). The Court directed the Government to present evidence "that would in a meaningful way refute his [Defendant's] hypothesis." (03/09 Tr. at 19:16-17). On March 16, 2012 and March 20, 2012, the Government presented Special Agent Lebron and Agent Pagan as witnesses to explain the nature of the operation and to refute Defendant's entrapment hypothesis. With the benefit of this evidence, the Court considers Defendant's three suppression motions.

A.     **Defendant's "Motion for Reconsideration of Denial of Suppression of Search and Seizure"**

In his Motion for Reconsideration, Defendant asked the Court to revisit its July 5, 2011 Memorandum Opinion and Order in light of the February 22, 2012 decision in *United States v. Lewis*. 672 F.3d 232. Because Defendant's written Motion for Reconsideration contains only two sentences—neither of which apply the *Lewis* finding to the facts of this case—the Court relies on the arguments presented by Defendant during the evidentiary hearings.

After the government's presentation of evidence, Defendant put forth his reconsideration argument, claiming that *Lewis* applies to this case because "*Arizona v. Gant*, which *Lewis* cited, said basically, if you stop someone for a traffic violation, that's all you can do. You can't, you don't have any basis for a search, unless you have probable cause for a search." (03/20 Tr. at 57:13-17).[13] Presumably, Defendant's argument intended to connect what he conceded to be the "very narrow" finding in *Lewis*, (05/20 Tr. at 57:13), to the significantly broader proposition that a warrantless traffic stop requires "reasonable, articulable suspicion that criminal activity is afoot." *See, e.g.*, *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). However, Defendant then

_____

[13] Contrary to Defendant's representation, *United States v. Lewis* does not cite to *Arizona v. Gant*. *See* 672 F.3d 232.

conceded that Task Force Agent Ojeda and Detective Rodriguez had probable cause to search Defendant's car before the stop. (03/20 Tr. at 58:21-59:2) ("I would agree, Judge, there would have to be probable cause, because the probable cause was established before the stop. They had suspicions from Gallows Bay . . . That would create, I believe, enough, reasonable cause to search . . . .").

After conceding that the presentation of evidence by the Government—which outlined Defendant's cooperation with undercover agents to transport two hundred kilograms of cocaine in the car that he was driving while he was subject to the traffic stop—constituted probable cause, Defendant then argued that *Lewis* applied to the case because "the justification for the stop was a pretext." (03/20 Tr. at 59:5-6). Then, after acknowledging that pretextual traffic stops following a traffic violation are permissible, Defendant argued—contrary to the evidence presented at the June 22, 2011 evidentiary hearing and the findings of the Court in the July 5, 2011 suppression opinion—that Defendant did not contravene traffic laws because he pulled over to the side of the road before using his cell phone. (03/20 Tr. at 59:21-24). Defendant offered no evidence for this assertion.

In *United States v. Lewis*, the Third Circuit held that "a contrived, after-the-fact explanation for the [pretextual] traffic stop" does constitute reasonable suspicion for an investigatory stop of a vehicle without a warrant. 672 F.3d at 237 ("Needless to say, a pretextual traffic stop requires the officer to have observed a traffic violation prior to initiating the traffic stop. Otherwise, the officer's motivation for the stop could not be pretextual. The corollary of this principle is that *ex post facto* justifications are impermissible."). None of the evidence presented to the Court during the four evidentiary hearings indicates that law enforcement relied upon after-the-fact justifications for the traffic stop. To the contrary, the testimony of Agents

LeBron and Pagan revealed that the Government had reasonable suspicion that Defendant was involved in criminal activity prior to the traffic stop, namely, Defendant's involvement with a criminal organization and undercover agents in a scheme to transport two hundred kilograms of cocaine from St. Croix to Puerto Rico. (03/20 Tr. at 22:3-6; 25:20-24; 27:2-4).[14]

The purpose of a motion for reconsideration "is to correct a clear error of law or to prevent a manifest injustice in the District Court's original ruling." *United States v. Dupree*, 617 F.3d 724, 732 (3d Cir. 2010). Motions for reconsideration "are granted for 'compelling reasons,' such as a change in the law which reveals that an earlier ruling was erroneous . . . ." *Id.* (quoting *Solis v. Current Dev. Corp.*, 557 F.3d 772, 780 (7th Cir. 2009)). Here, Defendant asks the Court to interpret the narrow finding of *United States v. Lewis*—that evidence acquired *after* the traffic stop may not constitute reasonable suspicion for the stop—to stand for the proposition that a search precipitated by a traffic violation and supported by reasonable suspicion arising from evidence acquired *before and during* the stop contravenes the mandates of the Fourth Amendment. The Court declines Defendant's invitation to do so. The decision in *United States v. Lewis* does not reveal any error of law in the Court's July 5, 2011 Opinion denying Defendant's Motion to Suppress or present any other ground for reconsideration. Accordingly, the Court will

---

[14] In *Lewis*, the Third Circuit emphasized its adherence to the Supreme Court's "bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely pretext for an investigation of some other crime." 672 F.3d at 237 (citing *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806 (1996)). On June 22, 2011, the Court heard testimony from Task Force Agent Ojeda that "the driver was operating a vehicle using a cell phone without a hands free device . . . [in] violation of Title 20, Virgin Islands Code, Section 509." (6/22 Tr. at 6:7-7:14). On July 5, 2011, the Court concluded "that because the officers saw Pichardo [Defendant] driving with a cell phone to his ear, they had probable cause to conduct the traffic stop." (Suppression Opinion; Dkt. No. 35 at 5). Moreover, "[o]nce a valid traffic stop is initiated, 'an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop . . . ." *United States v. Lewis*, 672 F.3d at 237 (citing *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003)).

deny Defendant's Motion for Reconsideration.

## B. Defendant's "Motion to Suppress Statements"

Defendant's "Motion to Suppress Statements," is predicated upon Defendant's assertion that the Court ruled on Fifth Amendment grounds for suppression without the benefit of Defendant's "written argument, presentation of all the evidence and full argument . . . ." (Dkt. No. 37 at 2). Defendant requested a second evidentiary hearing and "an opportunity to present full and complete evidence and argument on whether or not he was in custody at the time of his statements and therefore, whether or not *Miranda* was required." *Id*. First, Defendant argues that he was in custody at the time of the traffic stop and, accordingly, his statements, which were made in the absence of requisite *Miranda* warnings, should be suppressed. *Id.* at 2-3. Second, Defendant argues that after he was arrested, but before he was advised of his *Miranda* rights, he provided non-spontaneous statements to Task Force Agent Ojeda and Detective Rodriguez that were the product of impermissible interrogation. *Id.* at 4. The Court will consider each argument below.

### 1. Defendant's Statements Made During The Traffic Stop

A person who is temporarily detained pursuant to an ordinary traffic stop is not in custody for *Miranda* purposes. *Howes v. Fields*, No. 10-680, slip op. at 9, (U.S. Feb. 21, 2012) ("a person detained as a result of a traffic stop is not in *Miranda* custody."); *Shatzer v. Maryland*, 130 S. Ct. 1213, 1224 (2010) (the "temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop does not constitute *Miranda* custody"); *Berkemer v. McCarty*, 468 U.S. at 440 ("[P]ersons temporarily detained pursuant to [ordinary traffic stops] are not 'in custody" for the purposes of *Miranda*."); *Pennsylvania v. Bruder*, 488 U.S. 9, 10 (1988) (concluding that a motorist subject to an ordinary traffic stop "was not entitled to a recitation of

his constitutional rights prior to arrest, and his roadside responses to questioning were admissible."); *United States v. Whitney*, 350 F. App'x. 627, 630 (3d Cir. 2009) ("The Supreme Court long ago rejected this argument [that statements made during a traffic stop were obtained in violation of *Miranda*], holding in *Berkemer v. McCarty* that because of the 'non-coercive aspects of ordinary traffic stops,' motorists are not 'in custody' and therefore not entitled to *Miranda* warnings." (quoting *Berkemer v. McCarty*, 468 U.S. at 440).

Nothing in the evidence indicates that the events that transpired during the traffic stop were uniquely coercive or otherwise unusual as to characterize the incident as anything other than an "ordinary traffic stop."[15] In the afternoon of January 9, 2011, Task Force Agent Ojeda and Detective Rodriguez witnessed Defendant "operating the vehicle using a cell phone" in "violation of Title 20, Virgin Islands Code, Section 509." (06/22 Tr. at 5:19; 6:17-19; 7:13-14) (testimony of Task Force Agent Ojeda). Task Force Agent Ojeda "initiated the emergency blue lights and siren to indicate to the driver that I was attempting to stop him," and, although Defendant "hesitated" before pulling over, Defendant eventually pulled to the side of the road. (06/22 Tr. at 7:17-23).

Detective Rodriguez exited the police car and approached Defendant's vehicle from the left-hand side to speak with Defendant. Detective Rodriguez asked Defendant to "produce his driver's license, registration, and proof of insurance." (06/22 Tr. at 8:16-17). During this time, Task Force Agent Ojeda "called central dispatch and advised them that I was on the traffic stop."

---

[15] No evidence or argumentation was presented at the March 9, 2012, March 16, 2012 or March 20, 2012 evidentiary hearing relating to the allegedly custodial nature of the traffic stop. Neither Government witness was present at the traffic stop with Task Force Agent Ojeda or Detective Rodriguez. Agent Ojeda conducted the post-arrest interviews, but was not present at the traffic stop before the arrest. (03/16 Tr. at 16:15-20) (explaining that, after seeing Defendant at the residence in Whim Estates, he next saw Defendant at the traffic stop "being placed in the back seat of the patrol vehicle."). Defendant did not introduce any evidence or argumentation on this issue at the March 9, 2012, March 16, 2012 or March 20, 2012 evidentiary hearings.

(06/22 Tr. at 9:5-7). Next, Task Force Agent Ojeda exited the police vehicle and approached Defendant's vehicle from the rear right-hand side. While Detective Rodriguez assisted Defendant in finding the documents relating to the vehicle,[16] Task Force Agent Ojeda "observed the vehicle interior, for safety, you know, just in case there might be anyone else in the vehicle." (06/22 Tr. at 10:10-12).

Task Force Agent Ojeda subsequently observed "numerous large duffel bags, dark duffel bags in the rear, and rear passenger seats, and in the trunk area." (06/22 Tr. at 10:19-22). Task Force Agent Ojeda asked Defendant[17] "if he minds me taking a look. He [Defendant] says no, go ahead." (06/22 Tr. at 13:22-23). Task Force Agent Ojeda then searched the vehicle. (06/22 Tr. at 14:5-8) ("I searched the area of the passenger, front passenger area. I continued my way toward the rear, came back out, opened the passenger rear door, and I observed these bags."). Upon finding the duffel bags, Task Force Agent Ojeda asked Defendant if he could "take a look in the bag," and Defendant replied "go ahead." (06/22 Tr. at 14:14-15). After unzipping the bags, and observing "bricks, like objects wrapped in plastic," Task Force Agent Ojeda asked "what is this?" Defendant replied "I don't know," then "jumped in the vehicle from the . . . driver's side rear, and pulled, and opened the bags . . . completely." (06/22 Tr. at 14:17-23). Defendant then stated "you know what it is, you know what it is," then "got all nervous, put his hands on his head" and said "oh, my family, my family. Look what I did for a couple dollars . . . I'm so sorry, I have a debt, and there was—it was going to pay me $3,000 to take the stuff. Look what I did

---

[16] Defendant had difficulty locating the registration and proof of insurance, so Detective Rodriguez suggested that Defendant look in the glove compartment of the vehicle, because that is often where such documentation is kept in rental vehicles. (06/22 Tr. at 12:8-15) (testimony of Task Force Agent Ojeda); (06/22 Tr. at 30:11-14) (testimony of Detective Daniel Rodriguez).

[17] Task Force Agent Ojeda testified that he communicated with Defendant in Spanish. (06/22 Tr. at 13:25).

for a couple dollars." (06/22 Tr. at 15:5-15). Detective Rodriguez then arrested Defendant. (06/22 Tr. at 33:20-21).

Despite the routine nature of this traffic stop and the Supreme Court's repeated holding that motorists detained in ordinary traffic stops are not in custody for *Miranda* purposes, *see, e.g., Berkemer v. McCarty*, 468 U.S. at 440, Defendant argues that he was nonetheless in custody during the stop because Detective Rodriguez asked him to produce his identification and insurance documents as "an exercise of [Detective Rodriguez's] authority." (Dkt. No. 36-3). Because the Supreme Court "did not announce an absolute rule for all motorist detentions, observing that lower courts must be vigilant that police do not "delay formally arresting detained motorists, and . . . subject them to sustained and intimidating interrogation at the scene of their initial detention," *Berkemer v. McCarty*, 468 U.S. at 440, the Court will evaluate whether Defendant was in custody for the purposes of *Miranda* during the traffic stop.

In similarly deciding whether a non-arrested motorist was in custody for *Miranda* purposes during a traffic stop, the Third Circuit considered whether the motorist experienced a "restraint on freedom of movement of the degree associated with a formal arrest." *United States v. McNeil*, 416 F. App'x. 227, 229 (3d Cir. 2011) (citing *United States v. Leese,* 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler,* 463 U.S. 1121, 1125 (1983))). The following factors guide this inquiry: "(1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning." *United States v. Willaman,* 437 F.3d 354, 359–60 (3d Cir. 2006).

During the traffic stop, the officers did not inform Defendant that he was under arrest. The traffic stop occurred on a public street, in the vicinity of the Queen Mary Highway in Estate Sunny Isles, at approximately 3:30 p.m. (06/22 Tr. at 5:19-22) (testimony of Task Force Agent Ojeda). The traffic stop took approximately twenty minutes. (06/22 Tr. at 18:13). During this time, Defendant was not threatened. (06/22 Tr. at 18:9-10). Neither Task Force Agent Ojeda nor Detective Rodriguez drew their guns. (06/22 Tr. at 24:16-17) (testimony of Task Force Agent Ojeda); (06/22 Tr. at 40:21-24) (testimony of Detective Rodriguez). Defendant responded to Task Force Agent Ojeda's request to search his car with statements such as "go ahead," (06/22 Tr. at 14:14-15), and "that's your job." (06/22 Tr. at 44:9-11).

The evidence presented does not give rise to the conclusion that the traffic stop contained any occurrence or condition that rendered it custodial for *Miranda* purposes. *See United States v. McNeil*, 416 F. App'x. at 229 (When a defendant stopped by the police at a traffic stop "had not been told he was in custody, had not been placed in handcuffs or told to sit inside a police cruiser," the officer had not drawn his gun, and the events transpired on a public street shortly after the traffic stop, the defendant "was not restrained to the degree of a formal arrest."); *United States v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) ("In this case, the roadside detention of [Defendants] lasted between ten and fifteen minutes. During this time [the] [o]fficer searched the vehicle and its occupants for drugs and drug related contraband. Under these circumstances it was not error for the district court to refuse to suppress the roadside statements."). Accordingly, the obtainment of Defendant's statements made during the traffic stop does not run afoul of the requirements set forth in *Miranda*.

## 2. Defendant's Post-Arrest, Pre-*Miranda* Statements

Defendant's temporary detainment pursuant to a traffic stop did not invoke the *Miranda*

safeguards because his "freedom of action" was not "curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. at 442. However, the protections of *Miranda* did not automatically attach upon Defendant's arrest. "[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather [are only required] where a suspect in custody is subjected to interrogation." *Rhode Island v. Innis*, 446 U.S. at 300. Accordingly, "[f]or *Miranda's* protections to attach . . . a suspect must be both in custody and under interrogation (or its functional equivalent).[18] Otherwise, *Miranda* does not apply and the Fifth Amendment is not offended by a statement's admission into evidence." *United States v. Bonner*, 2012 WL 1514719, *4 (3d Cir. 2012) (citations omitted).

Accordingly, not "all statements obtained by the police after a person has been taken into custody are to be considered to be the product of interrogation." *Rhode Island v. Innis*, 446 U.S. at 299. "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence . . . Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Accordingly, when a defendant in custody voluntarily makes a statement, the government may admit that statement against the defendant. *See, e.g., United States v. Nelson*, No. 11-4342, *4 (3d Cir. May 16, 2012) (holding that although Defendant made statements while in custody, "there is no evidence that [the] Officer . . . prompted [Defendant] . . . to [make a statement] . . . The record shows that he freely and voluntarily [made a statement] . . . Because [Defendant] . . . made that statement of his own volition, the District Court did not err by allowing the government to admit the statement against him.").

---

[18] Custodial interrogation includes "either express questioning or its functional equivalent . . . [such as] any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. at 300-01.

Here, Task Force Agent Ojeda and Detective Rodriguez testified that as they arrested Defendant he said "oh, he [was] paid $3,000, he had a $10,000 debt, and I [Defendant] wanted to clear that. Look at what I [Defendant] did to my family." (06/22 Tr. at 17:17-19). After being placed in handcuffs, Task Force Agent Ojeda and Detective Rodriguez stopped asking questions, but Defendant continued to make incriminating statements. (06/22 Tr. at 34:17-22) (testimony of Detective Rodriguez) ("Q: When Defendant made those statements, were you or your partner questioning the defendant, at that time? A: No. At that time, I just walk him to our unit, placed him in the back of the unit. My partner [Task Force Agent Ojeda] called Immigration and Customs Enforcement detectives, agents."). Defendant's testimony corroborates the testimony of Task Force Agent Ojeda and Detective Rodriguez that Defendant was not asked any questions during the period between the arrest and the provision of *Miranda* warnings. (06/22 Tr. at 45:9-12) ("I was arrested. They called the officers, and they put me in the vehicle. And they take me to the office. And from there, they started asking me questions.") Because, as here, "there is no risk of *compelling* a defendant [in custody] to incriminate himself" absent "government agents actually eliciting statements," *Saranchak v. Beard*, 616 F.3d 292, 303 (3d Cir. 2010) (quoting *Rhode Island v. Innis*, 446 U.S. at 300), the obtainment of Defendant's statements did not violate the Fifth Amendment.

### C. Defendant's "Addition to Motion to Suppress Statements"

In his "Addition to Motion to Suppress Statements," Defendant seeks the suppression of his statements made during the telephone conversations that were recorded while Defendant was in custody at the Immigration and Customs Office. (Dkt. No. 71). At the March 9, 2012 evidentiary hearing, the Government represented that it did not oppose this motion "[w]ith respect to any statements that were made after the Defendant's arrest and when he was taken to

the office." (03/09 Tr. at 3:9-14).[19] The Government further represented, on the record, that it did

not intend to introduce Defendant's statements made during the phone call:

> [T]he defendant filed a motion after the defendant was taken to the office and he
> was given his *Miranda* rights, he made phone calls to two individuals. And the
> defendant is now seeking to suppress those, I guess, the substance of those phone
> calls. We are not, were were not planning to introduce those into evidence, Judge,
> so far as those phone calls are concerned, that is a moot issue."

(03/09 Tr. at 39:3-10) Because the Court is not deciding that the statements obtained

during Defendant's recorded telephone conversations were improperly acquired, but is instead

considering the Government's representation that it will not introduce the recorded statements

taken at the Customs and Immigration Office, it will deny Defendant's "Addition to Motion to

Suppress Statements" as moot and accept the Government's representation that it will not to

introduce the recorded telephone conversations.

In *United States v. Liburd*, the Third Circuit concluded that after a pretrial colloquy with

the Court regarding the defendant's suppression motion where a prosecutor represented to the

Court that the Government would not to introduce the statement in question at trial, the

prosecutor's subsequent introduction of that statement during the trial constituted prosecutorial

misconduct. 607 F.3d 339, 343 (3d Cir. 2010). ("Prosecutors routinely enter into agreements

with defendants—and make representations to the court—that exceed their minimum obligations

under the law. Whether they do so strategically or for reasons of convenience is of no moment.

Once prosecutors undertake such commitments, they are bound to honor them."). *See, e.g.,*

*United States v. McKinney,* 758 F.2d 1036, 1046 (5th Cir. 1985) ( "[A]greements between the

Government and a defendant to forego the presentation of otherwise admissible evidence are

---

[19] In its Opposition to Defendant's "Motion to Suppress Statements," the Government provided
"[t]o the extent that he seeks a second hearing with respect to statements made to law
enforcement after he was taken to the office, the government does not oppose the motion for this
limited purpose." (Dkt. No. 46 at 2).

enforceable."); *United States v. Jackson,* 621 F.2d 216, 220 (5th Cir. 1980) (stating that "when the government and a defendant enter into a pretrial agreement both parties are entitled to rely upon that agreement in preparing their respective cases."). Mindful of the Government's representation that it will not introduce the recorded telephone statements and the Government's obligation to honor that representation, the Court will deny Defendant's "Addition to Motion to Suppress Statements," (Dkt. No. 71) as moot.

### III.    CONCLUSION

For the foregoing reasons, Defendant's "Motion for Reconsideration of Denial of Suppression of Search and Seizure" is **DENIED**, Defendant's "Motion to Suppress Statements" is **DENIED** and Defendant's "Addition to Motion to Suppress Statements" is **DENIED AS MOOT**.


**SO ORDERED.**


Date: June 20, 2012                                     _____/s/_____
                                                        RAYMOND L. FINCH
                                                        Senior U.S. District Judge